UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA EX REL.
ALON AHARON, *et al.*,

                              Plaintiffs,

        v.

NUVANCE HEALTH, INC. *et al.*,

                              Defendants.

No. 24-CV-524 (KMK)

OPINION & ORDER

Appearances:

Kevin J. Minnick, Esq.
Hans Allhoff, Esq.
James W. Spertus, Esq.
Spertus, Landes & Josephs, LLP
Los Angeles, CA
*Counsel for Plaintiffs*

Jenny R. Kramer, Esq.
Matthew L.J.D. Dowell, Esq.
Theodore C. Altman, Esq.
Alston & Bird LLP
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

        Plaintiffs Dr. Alon Aharon ("Aharon"), Dr. Arie Blitz ("Blitz"), Dr. Jason Sperling

("Sperling") (collectively, "Plaintiffs" or "Relators") are cardiac surgeons who filed the instant

*qui tam* action against Nuvance Health Medical Practice ("NHMP"), Health Quest Systems

("HQS"), Vassar Brothers Medical Center ("Vassar"), Hudson Valley Cardiovascular Practice

("Heart Center"), Nuvance Health ("Nuvance") (together "corporate Defendants"), Dr.

Mumtazuddin Z. Jafar ("Jafar"), Dr. Rajeev L. Narayan ("Narayan") (together "cardiologist

Defendants"), Mark Warshofsky ("Warshofsky") (collectively "Defendants") under the False

Claims Act ("FCA"), 31 U.S.C. § 3729 et seq., seeking damages, civil penalties, attorneys fees,

and injunctive relief on behalf of the United States and themselves.  (*See* Am. Compl. ("AC")

¶¶ 291(a)–(b) (Dkt. No. 32).)[1]  Plaintiffs allege that Defendants conspired to and did engage in a

scheme to submit false claims to Medicare for heart valve replacement procedures (known as

"TAVRs").  (*See id.* ¶¶ 3–18.)  They further allege Defendants unlawfully retaliated against

Plaintiffs who complained about these misrepresentations.  (*See id.* ¶ 15.)

Before the Court is Defendants' Motion To Dismiss the Amended Complaint pursuant to

Federal Rules of Civil Procedure 12(b)(6) and 9(b) (the "Motion").  (*See generally* Not. of Mot.

("Defs. Mot.") (Dkt. No. 46).)  For the reasons that follow, the Court grants the Defendants'

Motion in part and denies it in part.

I.    <u>Background</u>

A.  <u>Factual Background</u>

Unless otherwise stated, the following facts are drawn from Plaintiffs' Amended

Complaint ("AC") and are assumed true for the purpose of resolving the instant Motion.  *See*

*Buon v. Spindler*, 65 F.4th 64, 69 n.1 (2d Cir. 2023) ("The factual summary below is derived

from the allegations in the [complaint], which we must accept as true in reviewing a motion to

dismiss".).

1.  <u>Transcatheter Aortic Valve Replacements ("TAVRs")</u>

TAVRs are procedures which provide a less invasive alternative to open-chest surgery.

(*See* AC ¶ 7; *see also id.*  ¶¶ 83–84.)  They are used to treat "aortic stenosis, a fairly common

---

[1] Unless otherwise noted, the Court cites to the ECF-stamped page number in the upper right corner of each page.

narrowing of the aortic valve that impedes blood flow and puts stress on the heart." (*Id.* ¶ 7; *see also id.* ¶ 82–85.) They involve "guiding a new, bio-prosthetic heart valve" through an artery and into the "narrowed aortic valve opening." (*Id.* ¶ 7.) And crucially, Plaintiffs allege that the TAVR procedure involves only two primary "operator" positions. (*See id.* ¶¶ 84, 199.)

TAVRs are popular, especially among Medicare beneficiaries. (*See id.* ¶ 8.) At Vassar, for example, 90% of TAVRs were for Medicare beneficiaries. (*See id.* ¶ 163.) TAVRs are also lucrative: Plaintiffs allege that at Vassar, TAVR reimbursements "run into the tens of millions." (*See id.*)

### 2. Medicare's National Coverage Determination ("NCD")

Medicare conditions its reimbursement for TAVRs on compliance with its regulatory policy known as a National Coverage Determination ("NCD").[2] (*See id.* ¶¶ 10, 76–77.) In the context of the TAVR procedure, Center for Medicare and Medicaid's ("CMS") NCD requires there be "joint participation" between a cardiologist and cardiac surgeon. (*See* AC Ex. B ("2019 NCD") 2 (Dkt. No. 32-2)).

The joint participation requirement was first promulgated in 2012, when Medicare coverage of TAVRs began. (*See* AC ¶ 88.) At that time, Medicare issued a TAVR NCD (the "2012 NCD") that provided that the patient must be under the care of a "a heart team: a cohesive, multidisciplinary team of medical professionals." (*Id.* ¶ 90.) The NCD described "[t]he heart team concept" as "embod[ying] collaboration and dedication across medical specialties to offer

---

[2] A National Coverage Determination is a "a determination by the [HHS] Secretary with respect to whether or not a particular item or service is covered nationally." 42 U.S.C. § 1395ff(1)(B). An NCD reflects the Center for Medicare and Medicaid's ("CMS") judgment about what is "reasonable and necessary . . . for the diagnosis or treatment of illness or injury." (*See* AC ¶ 80.) "Generally, Medicare will only reimburse medical treatment that it deems "reasonable and necessary." (*See id.* ¶ 76 (quoting 42 U.S.C. § 1395y(a)(1)(A)).)

optimal patient-centered care." (*Id*.) As relevant here, the 2012 NCD specifies that: "the heart team's interventional cardiologist(s) and cardiac surgeon(s) *must jointly participate* in the intra-operative technical aspects of TAVR." (*Id*. ¶ 91.) These two medical professionals—cardiac surgeons and cardiologists—have distinct areas of competency. (*See id*. ¶ 3.) As Plaintiffs allege, an "interventional cardiologist is not a cardiac surgeon." (*Id.*) While "cardiologists are qualified to conduct certain minimally invasive procedures," surgeons "have different training, different credentials, different certifications, and different expertise," which are "of vital importance to patient outcomes." (*Id.*)

In 2019, CMS updated its NCD requirement regarding TAVRs. (*See id.* ¶¶ 94–95; *see also generally* 2019 NCD.) During the notice and comment period preceding the change, CMS received at least some comments requesting that it modify the joint participation requirement to permit TAVRs to be conducted without a cardiac surgeon. (*See* AC ¶ 96.) The finalized 2019 NCD rejected calls to abandon the requirement that both an interventional cardiologist and cardiac surgeon jointly participate in the TAVR. (*See id*. ¶ 96 ("The NCD continues the requirement from the 2012 NCD for both an interventional cardiologist and cardiac surgeon to jointly participate in the intraoperative technical aspects of TAVR. During our evidence review there was not any data demonstrating equivalent or improved outcomes with a[n]…alternate operator combination.").) The final, updated 2019 NCD therefore reflects that the policy regarding the composition and participation of the heart team was not altered. (*See id*. ¶¶ 97–98.) That is, the 2019 NCD maintains the joint participation requirement, in spite of comments calling on CMS to eliminate or alter it. (*See id*. ¶¶ 95–98.)

3.  <u>Alleged Violation of the 2019 NCD's Joint Participation Requirement and Related Referral Scheme.</u>

Plaintiffs allege that Defendants violated the 2019 NCD's joint participation requirement by failing to permit cardiac surgeons, including Plaintiffs, to meaningfully participate in the TAVRs at Vassar. (*See id.* ¶¶ 184–200.)  Plaintiffs claim that when they participate in TAVRs, they are often limited to providing minor procedural support in the operation while cardiologists take up the two main operator positions.  (*See id.* ¶¶ 188–90, 194, 200, 204–07.)  And on occasion Plaintiffs allege that they do not scrub in at all.  (*See id*. ¶¶ 188–90, 205–07.)  Thus, according to the AC, in each TAVR procedure at Vassar, there are three physicians: two cardiologists who do most, if not all, of the work; and one cardiac surgeon, whose participation is limited or nonexistent.  This arrangement is maintained in spite of the fact that Medicare only reimburses Vassar for the work of *one* cardiac surgeon and *one* cardiologist, and thus Vassar or Nuvance must compensate the second cardiologist itself.  (*See id*. ¶ 142.)

Plaintiffs allege this arrangement is in furtherance of an illicit referral scheme:  Nuvance and Vassar benefit from TAVR referrals because Medicare reimbursements for "inpatient and outpatient hospital services associated with TAVR," are quite lucrative. (*See id*. ¶¶ 129, 163–65.)  Specifically, Plaintiffs allege that "[t]otal hospital reimbursements for the approximately 680 TAVRs performed [at Vassar] between 2016 and 2021 sum to approximately $33 million," (*see id*. ¶165), and that most of these TAVRs are for Medicare beneficiaries.  (*See id.* ¶ 163.)  To incentivize these lucrative referrals, the AC alleges that Nuvance and Vassar compensate Jafar and Narayan, and their employer Heart Center, for the volume and value of their TAVR referrals, and with control over the TAVR program.  (*See id*. ¶¶ 129, 132.)

Because openly engaging in such a referral scheme would violate the Stark Law, Plaintiffs allege Vassar and Nuvance compensate cardiologist Defendants and Heart Place

indirectly.[3]  Defendants Vassar and Nuvance assign Drs. Jafar and Narayan bonus compensation, in the form of "relative value units" (RVUs), which are ostensibly renumeration for their active participation as one of the two main operators in the TAVR procedure.[4]  (*See id.* ¶¶ 141, 144, 154.)  However, Plaintiffs allege that Defendants are paid far above market value for their participation as second operators in the TAVRs, (*see id.* ¶¶ 141, 145), a signal that they are in fact being paid indirectly for their referrals.  Plaintiffs also allege that in exchange for their referrals, Drs. Jafar and Narayan are given unfettered control of the TAVR program at Vassar. (*See id.* ¶ 129.)

Plaintiffs also allege that Nuvance indirectly pays Heart Place, Jafar and Narayan's employer, by subsidizing its operating costs by paying for salaries of medical personnel beyond Jafar and Narayan, and providing Heart Place with subsidized office space and medical equipment.  (*See id.* ¶¶ 122, 138, 139.)  Plaintiffs allege Heart Center's relationship with Nuvance requires that Heart Center's affiliates refer patients to Vassar and Nuvance affiliates for TAVRs and their associated services.  (*See id.* ¶¶ 139–40.)

---

[3] "The [Stark Law] provides that 'if a physician (or an immediate family member of such physician) has a financial relationship with [a covered] entity . . . then . . . the physician may not make a referral to the entity for the furnishing of designated health services.'"  *United States v. Maimonides Med. Ctr.*, No. 19-CV-4239, 2023 WL 6292538, at *5 (E.D.N.Y. Sept. 27, 2023) (citing 42 U.S.C. § 1395nn(a)(1)(A)).

[4] RVUs are a "'measure of productivity in the clinical setting,' tied to standard codes used in medical-billing settings. . . . RVUs objectively measure the effort, skills, and time a doctor devotes to a service rendered in a clinical setting."  *Beddoe v. Icahn Sch. of Med. at Mount Sinai*, No. 22-CV-3080, 2024 WL 989592, at *1 n.1 (S.D.N.Y. Mar. 7, 2024) (alteration adopted); *Edelman v. NYU Langone Health Sys.*, 708 F. Supp. 3d 409, 420 (S.D.N.Y. 2023) (same).

4. <u>Defendants' Alleged Retaliation Against Dr. Sperling</u>

Plaintiffs claim that corporate Defendants Vassar, Nuvance, NHMP, Heart Center, and HQS retaliated against Dr. Sperling for his complaints about these practices. (*See* Pl. Opp. 29–31.) Dr. Sperling served as the Chief of Cardiovascular Surgery at Vassar from January 2018 to October 2022. (*See* AC ¶ 36.) Dr. Sperling was highly critical of the exclusion of cardiac surgeons from TAVRs. (*See id.* ¶¶ 149, 199–200.) Specifically, the AC alleges that Dr. Sperling "began expressing [] concerns [about the TAVR program] almost as soon as he began his employment with Vassar in January 2018 and continued doing so until he was forced to leave Vassar." (*Id.* ¶ 199.) He raised these concerns "during a behind-closed-doors private recurring Heart Center cardiology meeting in 2018 . . . and in regular meetings with the leadership of Nuvance's Heart and Vascular Institute, which oversees the TAVR program." (*See id.*)

The AC alleges that Dr. Sperling encountered substantial backlash as a result of his complaints. (*See id.* ¶ 200.) Much of this backlash came from Dr. Narayan. Once, after other cardiac surgeons had been fired or quit, Dr. Narayan commented within earshot of Dr. Sperling: "it's a real red wedding on cardiac surgery, eh? Never going to know who's going to be next to fall, right?"[5] (*See id.* ¶ 225.) Plaintiffs allege this comment "alluded to a threat that another cardiac surgeon would be terminated soon." (*See id.* ¶ 225.) Narayan allegedly told Dr. Aharon: "[w]e are going to have Jason [Dr. Sperling] fired. We have spoken to the CEO and discussed this at the highest levels. . . . I have called surgeons that I know in NJ and NYC to see if they would like to look at the chief position here." (*See id.* ¶ 227.)

--------------

[5] "Red wedding" refers to "a particularly bloody episode of the television show Game of Thrones in which a rival family slaughtered another family and the King at a wedding." (*See* AC ¶ 225.)

The AC alleges that "[a]fter attempts to resolve these issues with Dr. Warshofsky, Dr. Sperling was informed in December 2021 that the [hospital] system would begin searching for his replacement." (*See id.* ¶ 233.) Plaintiffs allege variously that in October 2022, Vassar and/or Nuvance identified Dr. Sperling's replacement and "at the cardiologists' [Jafar and Narayan's] direction" placed him on paid administrative leave until his contract expired in July 2023. (*See id.* ¶ 200; *see also id.* ¶¶ 36, 233.)

     5.   <u>Defendants' Alleged Relationships to One Another</u>

Plaintiffs allege a dizzying web of relationships between the Parties. Nuvance is a large health system. (*See id.* ¶ 114.) According to the AC, Nuvance is also the "sole member" of HQS, NHMP, and Vassar. (*See id.* ¶ 131.) HQS and/or NHMP are the "parent organizations" of Heart Center. (*See id.*) Heart Center employs Jafar and Narayan, who are both cardiologists. (*See id.*) According to the AC, NHMP and Nuvance "maintain[] a business and contractual relationship with the Heart Center" regarding TAVR referrals. (*See id.* ¶ 210.) NHMP is also alleged to have employed Warshofsky, Dr. Aharon, and Dr. Sperling. (*See id.*; *see also id.* ¶ 120.)

As noted above, Dr. Sperling is a cardiac surgeon and was "Chief of Cardiovascular Surgery at Vassar from January 2018 to October 2022." (*Id.* ¶ 36.) Dr. Aharon is a cardiac surgeon who has worked "chiefly at Vassar" since 2018. (*See id.* ¶ 23.) Dr. Blitz is a cardiac surgeon "who served as a *locum tenens* cardiothoracic surgeon at Vassar" for approximately five months in 2021.[6] (*See id.* ¶ 31.)

_____

[6] "In the field of medicine, *locum tenens* refers to a temporary assignment, in which a skilled physician takes on the duties of a vacant position at a hospital or other clinical venue." (*See id.* ¶ 31 n.2.)

B.  Procedural Background

On January 20, 2022, Plaintiffs filed the instant Complaint in the U.S. District Court for the Northern District of New York.  (*See* Compl. (Dkt. No. 1).)  Because the Action was brought under the False Claims Act, the complaint was placed under seal while the Government made a determination about whether to intervene.  (*See generally* Dkt.)  The Government declined to intervene, and the case was unsealed as of October 18, 2023.  (*See* United States' Notice of Election to Decline Intervene (Dkt. No. 10).)  On January 24, 2024, the case was transferred to this Court.  (*See* Case Transfer Notice (Dkt. No. 29).)  On January 26, 2024, Plaintiffs filed an Amended Complaint.  (*See* AC.)

On April 5, 2024, Defendants filed their Motion to Dismiss.  (*See* Defs. Mot.; Mem. of Law in Supp. of Mot. to Dismiss ("Defs. Mem.") (Dkt. No. 47).)  Plaintiffs submitted an Opposition Brief on May 3, 2024.  (*See* Pls. Opp. Brief ("Pls. Opp.") (Dkt. No. 48).)  On May 23, 2024, Plaintiffs submitted a letter providing supplemental authority in support of their opposition.  (*See* Letter from Kevin J. Minnik, Esq., to Court (May 23, 2024) ("Pls. Ltr.") (Dkt. No. 49).)  Defendants submitted a reply in support of the Motion on May 24, 2024.  (*See* Defs. Rep. Mem. of Law in Supp. of Mot. to Dismiss ("Defs. Rep.") (Dkt. No. 50).)

## II.    Discussion

A.  Standard of Review

1.  12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to seek dismissal of a plaintiff's claim based on "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  At the motion to dismiss stage, "a court must 'draw all reasonable inferences in the plaintiff's favor, assume all well-pleaded factual allegations to be true, and determine

whether they plausibly give rise to an entitlement to relief.'" *United States v. Medtronic, Inc.*, No. 18-CV-1628, 2024 WL 4165522, at *3 (S.D.N.Y. Sept. 12, 2024) (quoting *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011)), *appeal withdrawn sub nom. U.S. ex rel. Powell v. Medtronic, Inc.*, No. 24-CV-2766, 2024 WL 5340768 (2d Cir. Nov. 18, 2024).

To survive a motion to dismiss, the Supreme Court has held that a complaint "does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration adopted) (internal quotation marks and citation omitted). However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration adopted) (internal quotation marks and citation omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570. Certainly, if a plaintiff has not "nudged [his] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed." *Id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

10

complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" (alteration adopted) (internal quotation marks and citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))).

    2.  <u>Rule 9(b)</u>

Federal Rule of Civil Procedure ("Rule") 9(b) requires that "a party [] state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  Rule 9(b) applies to claims of fraud under the FCA.  *See U.S. ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 26 (2d Cir. 2016); *see also Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1476–77 (2d Cir. 1995); *U.S. ex rel. NPT Assocs. v. Lab'y Corp. of Am. Holdings*, No. 07-CV-5696, 2022 WL 3718265, at *3 (S.D.N.Y. Aug. 29, 2022).

To satisfy Rule 9(b), a plaintiff must: "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."  *Bostick v. Am. Express Co.*, No. 24-CV-5484, 2024 WL 4826800, at *4 (S.D.N.Y. Nov. 13, 2024) (quoting *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 403 (2d Cir. 2015)).  The purpose of Rule 9(b) is "threefold—it is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit."  *Medtronic, Inc.*, 2024 WL 4165522, at *5 (quoting *Ladas*, 824 F.3d at 26).

  B.  <u>Analysis</u>

Plaintiffs make four claims: (1) Defendants presented false claims for payment, in violation of 31 U.S.C. § 3729(a)(1)(A); (2) Defendants made, used or caused to be made or used false statements, in violation of 31 U.S.C. § 3729(a)(1)(B); (3) Defendants conspired to make

false or fraudulent claims to obtain payment from the government, in violation of 31 U.S.C. § 3729(a)(1)(C); and (4) Defendants retaliated against Dr. Sperling for his lawful activity under the FCA, in violation of 31 U.S.C. § 3730(h). (*See* AC ¶¶ 257–91.)

Defendants argue Plaintiffs' FCA claims are insufficiently alleged under Federal Rules of Civil Procedure 9(b) and 12(b)(6), (*see* Defs. Mem. 12–28), and that Plaintiffs fail to plausibly allege a violation of the FCA's retaliation provision, (*see id*. at 28–29.)

      1.  <u>Group Pleading and Specificity Under Rule 9(b)</u>

Defendants argue that Plaintiffs have engaged in "group pleading," and failed to "plead with particularity facts demonstrating that each Defendant allegedly violated the FCA," in violation of Rule 9(b). (Defs. Mem. 12–13.) Specifically, Defendants contend that as to Nuvance, HQS, NHMP, and Dr. Warshofsky, Plaintiffs' claims do not plead sufficient allegations to meet Rule 9(b)'s requirements. (*See id* at 13.) Defendants argue that Plaintiffs' claims about Nuvance, HQS, and NHMP are vague or overly reliant on those entities' corporate affiliations with one another, and that Plaintiffs' claims about Dr. Warshofsky merely allege his affiliation because of his employment. (*See id*.)

"It is well-established in this Circuit that plaintiffs cannot simply 'lump' defendants together for pleading purposes." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Surgalign Spine Techs., Inc.*, No. 22-CV-9870, 2024 WL 477031, at *4 (S.D.N.Y. Feb. 7, 2024) (quoting *Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp.*, 531 F. Supp. 3d 673, 728 (S.D.N.Y. 2021)). "Plaintiffs must satisfy Rule 9(b) as to each defendant, and cannot do so by making vague allegations about the defendants as a unit." *Id*. (quoting *Monterey Bay Mil. Hous., LLC*, 531 F. Supp. 3d at 729). "This is so even where allegations are made against families of

affiliated entities." *Monterey Bay Mil. Hous., LLC*, 531 F. Supp. 3d at 728 (internal quotations omitted).

The Court concludes that Plaintiffs' claims against Nuvance are pled with sufficient particularity to satisfy Rule 9(b). Plaintiffs allege that Nuvance orchestrates the entire scheme, by sponsoring subsidies—in the form of excessive compensation—to the Heart Center's interventional cardiologists, (*see* AC ¶¶ 122, 129, 132–133, 141, 144), subsidizing many of the Heart Center's costs, (*see* AC ¶ 139), and maintaining a contractual relationship with the Heart Center which "takes the volume and value of their TAVR referrals into account," (*see* AC ¶¶ 122, 140,). These allegations are sufficiently specific to overcome Defendants' argument of group pleading. *See Monterey Bay Mil. Hous., LLC*, 531 F. Supp. 3d at 729 (finding the complaint did not suffer from group pleading where it outlined each entity's "role . . . in the alleged fraudulent scheme"); *Dornberger v. Metro. Life Ins. Co.*, 961 F. Supp. 506, 529 (S.D.N.Y. 1997) (concluding "[the p]laintiff has adequately linked each of the individual [d]efendants to the alleged fraudulent scheme" for purposes of Rule 9(b) where "[p]laintiff thoroughly describes a large, decades-long scheme, setting forth the role which [d]efendants played in that scheme"); *see also Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 2024 WL 477031, at *4–5 (concluding that the defendants were given "fair notice of the nature of [their] participation in the fraud" where the complaint alleged specific facts as to each defendant, notwithstanding the fact that the complaint referred to certain actions by defendants "collectively" (internal quotation marks omitted)).

However, Defendants rightly point out that Plaintiffs' claims as to HQS, NHMP, and Dr. Warshofsky are insufficiently pled to overcome Rule 9(b). (*See* Defs. Mem. 13–14.) Plaintiffs allege nothing more than that HQS and NHMP "aided and abetted" other Defendants or have a

"financial" or "contractual" relationship to other Defendants. (*See* AC ¶¶ 122, 131, 210, 211.) These bare assertions, without more, do not specify either Defendants' role in the alleged scheme, and therefore are insufficient to state a claim under Rule 9(b)'s heightened pleading standard. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 2024 WL 477031, at *4 (citing *DiVittorio v. Equidyne Extractive Indus., Inc*., 822 F.2d 1242, 1247 (2d Cir. 1987)); *U.S. ex rel. Hussain v. CDM Smith, Inc.*, No. 14-CV-9107, 2017 WL 4326523, at *11 (S.D.N.Y. Sept. 27, 2017) (dismissing corporate subsidiary from suit where complaint failed to engage in anything more than "group pleading and conclusory allegations" and to show that the entity "itself made any false claims" (internal quotation marks omitted)).

Furthermore, as to Dr. Warshofsky's submission of false claims, the AC conclusorily alleges that he "regularly submits, or causes to be submitted, claims for TAVR reimbursement despite noncompliance with the joint participation requirement and violations of the Stark Act." (*See id*. at ¶ 49.) Here too, the allegations lack sufficient detail to survive 9(b)'s heightened pleading standard. They do not allege Dr. Warshofsky's role in the alleged scheme or provide any specifics details that plausibly suggest his involvement. *See Mondelus v. August W. Dev., LLC,* No. 19-CV-4832, 2022 WL 182363, at *7 (E.D.N.Y. Jan. 20, 2022) (dismissing a defendant pursuant to Rule 9(b) where "the amended complaint generally allege[d] that he fraudulently received funds on behalf of the [p]laintiffs" but "fail[ed] entirely to allege [his] participation in the fraudulent scheme more generally, in any non-conclusory way. . . ."). In fact, the allegations do nothing more than "aver[] the substantive elements of [an FCA claim] without setting forth the particularized factual bases for the allegation," and thus "[do] not satisfy Rule 9(b)." *Spectrum Dynamics Med. Ltd. v. Gen. Elec. Co*., No. 18-CV-11386, 2023 WL 4159358, at *17 (S.D.N.Y. June 2, 2023) (quoting *Exergen Corp. v. Wal-Mart Stores, Inc*., 575 F.3d 1312,

1326–27 (Fed. Cir. 2009)).  Without adequately pleading his involvement in the submission of false claims, the AC cannot establish Dr. Warshofsky's liability under sections 31 U.S.C. § 3729(a)(1)(A) and (B).  *See U.S. ex rel. Gelbman v. City of New York*, No. 14-CV-771, 2018 WL 4761575, at *6–7 (S.D.N.Y. Sept. 30, 2018) (determining that the plaintiff failed to state an FCA claim where each of their allegations regarding the submission of false claims were entirely conclusory), *aff'd*, 790 F. App'x 244 (2d Cir. 2019); *see also Petrick v. Stars Bay Area, Inc.*, No. 19-CV-3105, 2021 WL 843183, at *4 (N.D. Cal. Mar. 5, 2021) (holding that conclusory allegations did not indicate "that [the defendant] actually submitted a false claim or statement to the federal government").

Therefore, as to NHMP, HQS and Warshofsky all claims (save the retaliation claims) are dismissed.[7]

### 2.  FCA Violations Related to Joint Participation Requirement

#### a.  Falsity

Claims brought under §§ 3729(a)(1)(A)–(B) of the FCA, such as those brought by Plaintiffs, require "proof of a falsehood or fraudulent scheme that renders the claim or statement in question 'false.'"  *See U.S. ex rel. Kester v. Novartis Pharms. Corp.*, No. 11-CV-8196, 2014 WL 2619014, at *4 (S.D.N.Y. June 10, 2014); *see also U.S. ex rel. SW Challenger, LLC v. EviCore Healthcare MSI, LLC*, No. 19-CV-2501, 2021 WL 3620427, at *8 (S.D.N.Y. Aug. 13, 2021) (same), *aff'd sub nom. Doe 1 v. EviCore Healthcare MSI, LLC*, No. 22-CV-530, 2023 WL

---

[7] Because the FCA's anti-retaliation provision does not require that a defendant participate in any actual fraud, the particularity requirements of Rule 9(b) do not apply to retaliation claims under the FCA.  *See U.S. ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 95 (2d Cir. 2017) ("The particularity requirement of Rule 9(b) does not apply to retaliation claims under the FCA."); *Bernstein v. Silverman,* No. 20-CV-630, 2024 WL 3595621, at *14 (N.D.N.Y. July 31, 2024) (same).

2249577, at *8 (2d Cir. Feb. 28, 2023). A claim can be either factually or legally false. *U.S. ex rel. Lee v. N. Metro. Found. for Healthcare, Inc.*, No. 13-CV-4933, 2021 WL 3774185, at *3 (E.D.N.Y. Aug. 25, 2021) ("A false or fraudulent claim under the FCA may be factually false or legally false." (internal quotations and citations omitted)), *aff'd sub nom. Lee v. N. Metro. Found. for Healthcare, Inc.*, No. 21-CV-2155, 2022 WL 17366627 (2d Cir. Dec. 2, 2022).

Plaintiffs allege that Defendants' violation of the "joint participation" requirement of the 2019 NCD was expressly and implicitly false. (*See* AC ¶ 177.) According to Plaintiffs, Vassar and Drs. Jafar and Narayan submitted expressly false certifications when they affirmatively represented "on a claim form that the TAVR complied with all laws and regulations" and included the "billing modifier -62, which is a representation that two different operators worked on the TAVR." (*See* Pls. Opp. 9; *see also* AC ¶ 162.) Defendants' implied false certifications were their submissions that "fail[ed] to disclose the noncompliance." (*See* Pls. Opp. 9.)

Although the 2019 NCD and the 2012 NCD do not define the term "jointly," (*see generally* AC Ex. A ("2012 NCD") (Dkt. No. 32-1); 2019 NCD), both documents clearly specify that the interventional cardiologists and cardiac surgeons must "jointly participate in the *intra-operative technical aspects* of TAVR," (*see* 2012 NCD 7 (emphasis added); 2019 NCD 2 (emphasis added).)

CMS's choice to specify that the participation must be *intra*-operative and *technical* suggests that each specialist must do more than simply observe the procedure. "Intra-operative" refers to something which is "occurring, carried out, or encountered *in the course of surgery*." *Intraoperative (adjective)*, Merriam-Webster, https://www.merriam-webster.com/medical/intraoperative [https://perma.cc/U598-U2WZ] (emphasis added). The cardiac surgeons' participation must therefore occur in the course of surgery. Further, their

participation must be "technical." "Technical" is a quality that is "marked by or characteristic of specialization." *Technical (adjective)*, Merriam-Webster, https://www.merriam-webster.com/dictionary/technical [https://perma.cc/99EY-XSWV] (emphasis added). In this case, that means that the cardiac surgeon's participation *in the course of* the TAVRs must be *characteristic of their specialization* as a cardiac surgeon.

As to at least some of the incidents described in the AC, the allegations indicate that Plaintiffs did not participate "in the course of" the TAVR, or in a manner that was "characteristic of their specialization." For example, Plaintiffs' allegations describe incidents in which they did not scrub in at all, or else scrubbed in and simply observed the procedure without taking any part in it. (*See* AC ¶¶ 188, 194, 204–06.) Observation is not an activity which ordinarily requires expertise or specialty training.[8] Therefore, the Court finds it is plausible to infer that these incidents did not require participation that was characteristic of Plaintiffs' specialization. Thus, as to these incidents, Plaintiffs have adequately pled that they did not "jointly participate" in the TAVR, and certifications to the contrary were likely false.

Other incidents described in the AC are less clear. For example, the AC alleges that Dr. Aharon's participation in TAVRs has been limited to "momentar[ily] handling [] the catheter" by "standing still with a hand on the instrument without moving it." (AC ¶ 188.) Similarly, the AC alleges that in several incidents, Dr. Blitz's participation was limited to "holding the sheath and the catheter" while the cardiologists "performed the entirety of the procedure." (*Id*. ¶ 194.) This participation took "about one or two minutes." (*Id*.) Though the Court does not profess to have

---

[8] For example, some hospitals permit students as young as 18 observe surgeries. *See, e.g.*, *Observer Opportunities in Surgery*, MD Anderson Cancer Center, https://www.mdanderson.org/education-training/outreach-programs/observer-programs/observer-opportunities-in-surgery.html [https://perma.cc/9RVL-4FYD].

expertise in TAVR procedures, these allegations suggest that Plaintiffs' participation during these incidents was minor and uncomplicated. Construing all inferences in Plaintiffs' favor, as is required at this stage, the Court finds that it is plausible, rather than merely possible, that these incidents did not involve the cardiac surgeons' "technical" participation in the TAVR procedures.

In sum, the "joint participation" requirement demands something more than passive or *de minimis* participation in the TAVR procedure. Plaintiffs adequately allege falsity as to the instances in which the cardiac surgeons did not participate in the TAVRs at all, or else participated nominally.

b. Scienter

Defendants argue that the AC fails to plausibly allege that they acted with the scienter required by the FCA. (*See* Defs. Mem. 20–21.) The FCA's scienter requirement is a "rigorous" one. *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 192 (2016). Section 3729 (b)(1)(A) of the FCA requires that Defendants acted with "actual knowledge," "in deliberate ignorance," or "in reckless disregard" of the information's falsity. 31 U.S.C. § 3729(b)(1)(A); *see also United States v. Strock*, 982 F.3d 51, 65–66 (2d Cir. 2020).

However, Plaintiffs are not required to show "specific intent to defraud." 31 U.S.C. § 3729 (b)(1)(B); *see also U.S. ex rel. Henig v. Amazon.com, Inc.*, No. 19-CV-5673, 2025 WL 27736, at *6 (S.D.N.Y. Jan. 3, 2025) (same) (citing *U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 926 F. Supp. 2d 510, 522 (S.D.N.Y. 2013)). And as to regulatory requirements that are subject to multiple interpretations, the Supreme Court has held that the FCA's scienter requirement "refers to a defendant's knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed." *U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749

(2023); *see also Scollick ex rel. U.S. v. Narula*, No. 14-CV-1339, 2024 WL 2017132, at \*4 (D.D.C. May 7, 2024) (noting that the Supreme Court has required the scienter element of an FCA claim be analyzed subjectively).

Furthermore, under Rule 9(b), Plaintiffs must show "the factual basis which gives rise to a strong inference of fraudulent intent." *Strock*, 982 F.3d at 66 (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)); *see also U.S. ex rel. Camburn v. Novartis Pharms. Corp.*, 124 F.4th 129, 135–36 (2d Cir. 2024) (noting that the plaintiff was "obligated to 'plead the factual basis' that 'gives rise to a strong inference of fraudulent intent'" (quoting *U.S. ex rel. Hart v. McKesson Corp.*, 96 F.4th 145, 153 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 163 (2024)); *Fed. Deposit Ins. Corp. v. Fifth Third Bank, N.A.*, No. 23-CV-209, 2023 WL 7130553, at \*2 (2d Cir. Oct. 30, 2023) (same) (summary order). Fraudulent intent can be shown in two ways: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Strock,* 982 F.3d at 66 (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006)). Finally, "[t]he complaint must plead facts supporting scienter as to each defendant." *Id.* at 66–68; *see also In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009) ("In a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible."); *Li v. Eqonex Ltd.*, No. 23-CV-03346, 2024 WL 4241951, at \*11 (S.D.N.Y. Sept. 18, 2024) (same).

In the context of the FCA, some courts have found that termination or other hostile reactions to a complaining employee can be determinative of scienter—though none has found that hostility *alone* is sufficient to satisfy the scienter requirement. In *Godecke v. Kinetic*

*Concepts, Inc.*, 937 F.3d 1201 (9th Cir. 2019), the Ninth Circuit reversed a district court's

determination that scienter was insufficiently alleged where—in combination with other

particular company practices and efforts at concealment—the complaint pled that when the

plaintiff "raised concerns about whether [the defendant] was following proper rules for billing

Medicare, [the defendant] quickly fired not only [the plaintiff], but also her supervisor, and the

senior vice president to whom they both reported." *See id.* at 1212.  In *United States v. General*

*Hospital Corp.*, 394 F. Supp. 3d 174 (D. Mass. 2019), the court concluded that the "reaction to

internal allegations of non-compliance" plausibly suggested "deliberate indifference and reckless

disregard" where the complaint alleged that the hospital had repeatedly ignored internal

complaints about non-compliance and where complaining employees had been removed from

their posts or prevented from working with the employees they alleged were submitting

fraudulent claims.  *See id.* at 190 (citations omitted).  This conclusion was supported by other

allegations, such as ones "alleging a broader scheme to defraud Medicare and Medicaid" and

"active concealment" efforts.  *See id*.

  More broadly, courts have held that actions taken to hide a defendant's potential non-

compliance with a regulatory requirement suggest scienter.  *See U.S. ex rel. Campie v. Gilead*

*Scis., Inc.*, 862 F.3d 890, 904 (9th Cir. 2017) (concluding that the plaintiffs plausibly pled

scienter where they alleged that the defendant "took actions to hide its fraud"); *U.S. ex rel.*

*Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1081 (N.D. Cal. 2020) (same); *cf. U.S. ex rel.*

*Hart v. McKesson Corp.*, 96 F.4th 145, 160 (2d Cir. 2024) (stating, in the context of an Anti-

Kickback Statute analysis, that courts in the Second Circuit have found "concealment probative

of wrongful intent . . . when the concealment happened *concurrently* with the violation" and

collecting cases (emphasis in original)).[9]

Here, Plaintiffs allege that when they raised concerns about the manner in which the

TAVRs were being conducted, Drs. Narayan and Jafar responded by threatening them.

Specifically, the AC alleges that Dr. Narayan told Dr. Aharon—during a review of the TAVR

program—that he would have him fired, and that he and Dr. Jafar were also "going to have [Dr.

---

[9] The Parties make much of the Second Circuit's holding in *Hart*. In that case, the Second Circuit held a plaintiff could not rely on the mere fact that he had complained to his employer, without more, to satisfy a "willfulness" scienter standard. *See* 96 F.4th at 161–62; *see also Maimonides Med. Ctr.*, 2023 WL 6292538, at *4 (concluding that allegations that a relator "criticized" his employer's program, without more, could not plausibly suggest scienter for the purposes of a claimed violation of the Anti-Kickback Statute).

First, the Court notes that *Hart* was primarily concerned with a separate statute's scienter requirement—namely, the meaning of "willfully" under the Anti-Kickback Statute. *See* 96 F.4th at 153–60. The Second Circuit in *Hart* held that "willfully" means "with a bad purpose" or, in other words, "with knowledge that [the] conduct was unlawful." *Id*. at 157. By contrast, the FCA permits scienter to be alleged under circumstances where a defendant can be shown to have acted with "deliberate indifference" and "reckless disregard." *See* 31 U.S.C. §§ 3729(b)(1)(A); *see also Strock*, 982 F.3d at 65–66. "The deliberate ignorance and reckless disregard standards are intended to capture 'an individual who has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted.'" *United States v. Hyman*, No. 16-CV-5363, 2022 WL 17820060, at *8 (E.D.N.Y. Sept. 9, 2022) (quoting *U.S. ex rel. Taylor v. Gabelli*, 345 F. Supp 2d 313, 330 (S.D.N.Y. 2004)) (alteration adopted)). Thus, the two scienter standards are distinguishable: defendant's conduct may fail to demonstrate that they acted "with a bad purpose" but nevertheless be sufficient to show that they "buried their head in the sand." *Id.*

Second, *Hart* involves distinguishable facts. In *Hart*, the Second Circuit held that employee complaints were insufficient to establish willfulness where there was no additional evidence suggesting the employer agreed with the plaintiff's assessment that its conduct was illegal. *See* 96 F.4th at 161 ("Hart does not allege that his supervisor agreed with him or even expressed any concern that Hart may have been right.") In contrast, the allegations here suggest that Narayan and to some extent Jafar, Vassar, and Nuvance reacted to Plaintiffs' complaints with hostility. (*See* AC ¶¶ 200, 225–27, 230, 233.) These responses go a step beyond indicating mere awareness of Plaintiffs' concerns, and plausibly suggest that Defendants acted with a culpable state of mind. *See Godecke*, 937 F.3d at 1212 (concluding scienter was adequately alleged where, inter alia, the plaintiff was fired after voicing concerns); *Gen. Hosp. Corp.*, 394 F. Supp. 3d at 190 (concluding that scienter was sufficiently pled where, inter alia, plaintiffs alleged hostility to their complaints).

21

Sperling] fired." (*See* AC ¶ 227.) The AC further alleges that Dr. Narayan suggested, within earshot of Dr. Sperling, that it was a "real red wedding on cardiac surgery" and that one could never know "who's going to be the next to fall." (*See id.* ¶ 225.) When Dr. Sperling asked Dr. Jafar not to "fan the flames," Dr. Jafar told him he would "burn the place to the ground" and "warned that he has survived five CEOs." (*See id.* ¶ 230.) The AC also alleges that the cardiologists made good on these threats by directing Vassar and Nuvance to terminate Dr. Sperling. (*See id.* ¶¶ 200, 233.)

Relatedly, as to Nuvance and Vassar, the AC alleges that in response to Plaintiffs' repeated complaints, Nuvance and Vassar had Dr. Sperling removed. (*See id.* ¶¶ 200, 233.) The AC also alleges that "[i]f Dr. Sperling did not jointly participate, he would not append modifier 62 to his CPT code, but on information and belief, Vassar billing staff would add the modifier later in order to obtain Medicare reimbursement." (*Id.* ¶ 200.) The AC also (somewhat conclusorily) alleges that when Plaintiffs raised concerns about compliance with the joint participation requirement, Vassar and Nuvance responded with "resistance, retaliation, and an expectation to toe the party line." (*See id.* ¶ 200.)

However, further bolstering these pleadings are Plaintiffs' allegations that Defendants had the motive and opportunity to—at the very least— "look the other way" as to the false claims: the two-cardiologist arrangement provided them with a means of laundering and incentivizing an illicit referral scheme for TAVRs. (*See* Pls. Opp. 19; AC ¶¶ 8–9, 129, 132–42.) That such a scheme would motivate Defendants to recklessly disregard their non-compliance with CMS regulations can support a plaintiff's claim of scienter. *See U.S. ex rel. Ellsworth Assoc., LLP v. CVS Health Corp.*, 660 F. Supp. 3d 381, 403 (E.D. Pa. 2023) (concluding scienter

was adequately alleged where the plaintiff "claim[ed] that [d]efendants' conduct was not the

product of innocent mistakes, but purposefully [] part of a larger fraudulent scheme").

It may be the case that each of these allegations alone would be insufficient to satisfy the

scienter requirement.  Nevertheless, construing the totality of the inferences arising from the

allegations in Plaintiffs' favor, the Court finds that scienter has been adequately pled.  *See La

Pecora Bianca Holdings, LLC v. Empowered Hosp. LLC*, No. 19-CV-9655, 2021 WL 1164267,

at *6 (S.D.N.Y. Mar. 25, 2021) (holding, pursuant to a Rule 9(b) analysis, that "[p]laintiffs have

only the 'burden of pleading circumstances that provide at least a minimal factual basis for their

conclusory allegations of scienter'" (quoting *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir.

1994)).  Defendants' statements, the timing and nature of the adverse actions taken against

Plaintiffs, and Defendants' alleged motivation in perpetuating a referral scheme—when taken

together—at least *plausibly* suggest scienter.  *See Godecke*, 937 F.3d at 1212 (concluding that

scienter was adequately alleged by looking at the totality of the circumstances suggested the

defendants had acted with deliberate indifference); *see also Villella v. Chem. & Mining Co. of

Chile Inc.*, No. 15-CV-2106, 2017 WL 1169629, at *14 (S.D.N.Y. Mar. 28, 2017) ("[T]he Court

finds that taking the facts as a whole, Plaintiff has adequately alleged facts creating an inference

of scienter.").

### c.    Materiality

"A misrepresentation about compliance with a statutory, regulatory, or contractual

requirement must be material to the Government's payment decision in order to be actionable

under the False Claims Act." *Escobar*, 579 U.S. at 181.  Materiality "looks to the effect on the

likely or actual behavior of the recipient of the alleged misrepresentation." *Id*. at 193 (internal

quotations and alterations omitted).  This standard is "demanding." *Id*. at 194.  "[R]elevant

factors in evaluating materiality include: (1) whether the government expressly designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment; (2) the government's response to noncompliance with the relevant contractual, statutory, or regulatory provision; and (3) whether the defendants' alleged noncompliance was minor or insubstantial." *U.S. ex rel. Foreman v. AECOM*, 19 F.4th 85, 110 (2d Cir. 2021); *see also Escobar*, 579 U.S. at 194–95 (same); *Strock*, 982 F.3d at 59 (same). Defendants argue that Plaintiffs' FCA claims fail to adequately allege materiality, because they do not identify an express condition of payment attached to the joint participation, they cannot demonstrate that the government has denied claims for the same errors, and the violations—such that they are—are "insubstantial." (*See* Defs. Mem. 21–23.)

As to whether compliance with the joint participation requirement is an express condition of payment: "[t]he TAVR NCD premises the condition of payment on the 'reasonable and necessary' requirement of § 1395y(a)(1)(A)." *U.S. ex rel. Lynch v. Univ. of Cincinnati Med. Ctr., LLC*, No. 18-CV-587, 2020 WL 1322790, at *20 (S.D. Ohio Mar. 20, 2020). Medicare *only* reimburses medical treatment that it deems "reasonable and necessary." 42 U.S.C. § 1395y(a)(1)(A). (*See* AC ¶ 76.) "Section 1395y(a)(1)(A) specifies when payment will not be authorized under Medicare: 'no payment may be made under part A or part B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.'" *Lynch*, 2020 WL 1322790, at *20 (alterations adopted) (emphasis omitted). The NCD manual specifies "whether specific medical items, services, treatment procedures, or technologies *can be paid for* under Medicare." *Id*. (internal quotation marks omitted). The NCD manual states that: "'[w]here an item/service is stated to be covered, *but such coverage is explicitly limited to*

*specified indications or specified circumstances*, all limitations on coverage are based on

[Section] 1862(a)(1) of the Act,' i.e., the 'not reasonable and necessary' exclusion set forth in 42

U.S.C. § 1395y(a)(1)." *Id*. (alteration adopted) (emphasis in original).

The TAVR NCD states "TAVR is covered . . . when *all* of the following conditions are

met." (2019 NCD 2.) Among these conditions is that: "[t]he heart team's interventional

cardiologist(s) and cardiac surgeon(s) must jointly participate in the intra-operative technical

aspects of TAVR." (*Id*.) The prefatory language indicating that "all" of the conditions outlined

in the 2019 NCD must be met is a "strong indication that the [joint participation] requirement is

'condition of payment' for TAVR procedures under Medicare" and therefore "supports a finding

that [Defendants'] failure to comply" with the joint participation requirement was "material to

the government's payment decision." *Lynch*, 2020 WL 1322790, at \*20 (S.D. Ohio Mar. 20,

2020) (applying the same rationale to another part of the 2019 NCD); *see also U.S. ex rel Lemon*

*v. Nurses To Go, Inc*., 924 F.3d 155, 161 (5th Cir. 2019) (determining that prefatory language

indicating payment would be appropriate "only if" a particular requirement was met cut in favor

of finding materiality).

As to the question of past government action: while it is true that Plaintiffs have not

identified an instance in which a TAVR claim was denied for non-compliance with the NCD's

joint participation requirement, Plaintiffs correctly argue that this does not preclude a finding of

materiality. (*See* Pls. Opp. 23 (citing *Escobar*, 579 U.S. at 194–95 (noting that "proof of

materiality *can include, but is not necessarily limited to,* evidence that the defendant knows that

the Government consistently refuses to pay claims in the mine run of cases based on

noncompliance with the particular statutory, regulatory, or contractual requirement")(emphasis

added))); *see also U.S. ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822,

834 (6th Cir. 2018) ("Although a relator in a *qui tam* action faces a demanding standard at the motion-to-dismiss stage with respect to pleading materiality, she is not required to make allegations regarding past government action."); *Lynch*, 2020 WL 1322790, at *20 ("A relator is not required to make allegations regarding past government action at the pleading stage to survive a motion to dismiss." (internal citations and quotation marks omitted)).

Finally, as to the question of whether noncompliance went to the "essence of the bargain," and was thus material, *see Escobar*, 579 U.S. at 193 n.5 (internal quotation marks omitted), statements made by CMS in connection with the 2012 NCD strongly suggest that CMS views the joint participation requirement as an important part of the procedure. In its decision memo regarding the 2019 NCD, CMS noted that its decision to maintain the joint participation requirement "emphasizes the importance of the heart team," (*see* 2012 NCD 47). In the same passage, CMS states that "the heart team is *critical* to ensuring TAVR is performed and provided appropriately." (*Id*. (emphasis added).) These allegations plausibly plead the joint participation requirement is an essential condition of the bargain, and therefore that compliance is material. *See Lynch*, 2020 WL 1322790, at *22 (relying on, inter alia, the language of the 2019 NCD in order to determine whether compliance went to the essence of the bargain); *see also U.S. ex rel. Gardner v. Vanda Pharms., Inc.*, 554 F. Supp. 3d 146, 161 (D.D.C. 2021) (relying on the language of CMS guidance to determine whether compliance with a particular requirement went to the "essence of the bargain").

Taking all of the factors into consideration, the Court concludes that Plaintiffs have included sufficient allegations to plausibly meet the materiality requirement.

* * *

26

In sum, Plaintiffs have adequately alleged falsity, knowledge, and materiality, as required by the FCA. Therefore, Defendants' Motion is denied as to Nuvance, Vassar, Jafar, and Narayan.

3. FCA Violations related to Stark Law

Defendants correctly assert that as to the alleged Stark Law violations, Plaintiffs fail to "allege a single claim Vassar [] submitted to Medicare that resulted from an improper referral by one of the cardiologists." (*See* Defs. Mem. 26.) Plaintiffs argue that they have met their burden, by alleging "details of a scheme paired with 'reliable indicia that lead to a strong inference that claims were submitted.'" (*See* Pls. Opp. 25 (citing *United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc*., 865 F.3d 71, 89 (2d Cir. 2017).)

It is true that the Second Circuit, in *Chorches*, held that Rule 9(b) "does not require that every *qui tam* complaint provide details of actual bills or invoices submitted to the government, so long as the relator makes plausible allegations . . . that lead to a strong inference that specific claims were indeed submitted and that information about the details of the claims submitted are peculiarly within the opposing party's knowledge." 865 F.3d at 93; *see also Pilat v. Amedisys, Inc*., No. 23-CV-566, 2024 WL 177990, at *2–3 (2d Cir. Jan. 17, 2024) (applying the same standard) (summary order); *Medtronic, Inc.*, 2024 WL 4165522, at *7 (noting that "an FCA complaint can sometimes satisfy Rule 9(b)'s particularity requirement by making 'plausible allegations'. . . 'that specific false claims were submitted' and that 'those claims is peculiarly within the opposing party's knowledge'" (quoting *Chorches*, 865 F.3d at 86)).

However, in *Chorches,* the Second Circuit permitted a plaintiff to allege an FCA violation without providing particular information about any claim submitted to the government where the plaintiff had pled factual allegations indicating that the defendant's "billing

procedures . . . made it virtually impossible for most employees to have access to all of the information necessary to certify on personal knowledge both that a particular invoice was submitted for payment and that the facts stated to justify the invoice were false." 865 F.3d at 82. Here, as in *Chorches*, Plaintiffs fail to provide any specific details of claims which they allege were submitted to the government as a result of a referral which violated the Stark Law. (*See generally* AC.) However, *Chorches* cannot excuse this failure, because Plaintiffs also fail to provide any detail as to their "reasons for not having personal knowledge of the contents" of such false claims. *U.S. ex rel. Gelbman v. City of New York*, 790 F. App'x 244, 249 (2d Cir. 2019) (summary order); *see also U.S. ex rel. Duhaine v. Apple Health Care Inc.*, No. 19-CV-963, 2022 WL 3226631, at *9 (D. Conn. Aug. 10, 2022) ("[T]he Amended Complaint does not plausibly allege that the information regarding the submission of claims for reimbursement to Medicare is peculiarly within the Defendant's knowledge and control so as to forgive the level of particularity ordinarily required."); *U.S. ex rel. Bonzani v. United Techs. Corp.*, No. 16-CV-1730, 2019 WL 1440384, at *3–4 (D. Conn. Apr. 1, 2019) (rejecting a plaintiff's claim that the failure to identify specific false claims should be excused under *Chorches* because he failed to establish that the information in question was "peculiarly within the knowledge of defendants"). This lack of specificity dooms Plaintiffs' Stark Law claims, and therefore the Court grants Defendants' Motion on this claim. *See U.S. ex rel. Gallian v. AmerisourceBergen Corp.*, No. 16-CV-2458, 2022 WL 20611664, at *6 (E.D.N.Y. Dec. 22, 2022) (dismissing the plaintiff's claim where the complaint was "bereft of any allegations that the particular bills submitted for reimbursement [were] peculiarly within defendants' knowledge and control"); *Gelbman*, 2018 WL 4761575, at *8 (same).

4.  Conspiracy

Plaintiffs also allege that Defendants conspired in to violate the FCA.  (*See* AC ¶¶ 282–

85; *see also* Pl. Opp. 28–29.)  Defendants argue that Plaintiffs' conspiracy claims cannot survive

because the claim violates the intra-corporate conspiracy doctrine.  (*See* Defs. Mem. 26–28.)

The intra-corporate conspiracy doctrine "prohibits a conspiracy claim against employees of the

same entity acting within the scope of their employment, because they are considered a single

entity and, therefore, are legally incapable of conspiring with each other."  *Moss v. Bd. of Educ.*

*of Sachem Cent. Sch. Dist.*, No. 22-CV-6212, 2024 WL 3328637, at *14 (E.D.N.Y. July 8,

2024).  In the case of corporations and their subsidiaries, Defendants are required to show "a

complete unity of interest" such that the conspiratorial actions can "be viewed as that of a single

enterprise."  *U.S. ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*, 318 F. Supp. 3d 680, 705

(S.D.N.Y. 2018) (internal quotations omitted).

Plaintiffs have plainly alleged that corporate Defendants are parents and subsidiaries of

one another, and that individual defendants are their employees.  (*See* AC ¶ 131.)  The AC

specifically alleges that Nuvance is the *sole member* of HQS, NHMP, and Vassar, and that HQS

and/or NHMP are the *parent organizations* of Heart Center, and that the Heart Center employs

Jafar and Narayan.  (*See id.*)  Contrary to Plaintiffs' arguments, (*see* Pls. Opp. 28), these

allegations do not plausibly suggest two separate corporate families are involved.[10]  Rather, they

_____

[10] Plaintiffs point to various portions of the AC in which they appear to allege that the
relationship between Nuvance, Vassar, NHMP, and Health Center is one of corporate
"affiliation" rather than sole ownership.  (*See* Pls. Opp. 28.)  But Plaintiffs' allegations at
paragraph 131 are clear that Nuvance is the "*sole member*" of Vassar, NHMP, and HQS, and that
NHMP/HQS are the "parent organizations" of the Heart Center.  (*See* AC ¶ 131.)  The Court is not
free to read allegations out of the complaint where it suits the Parties.  *Cf. In re Teekay Offshore*
*Partners L.P. Common Unitholders Litig.*, No. 19-CV-6483, 2021 WL 1227415, at *5 (S.D.N.Y.
Mar. 31, 2021) (noting that where "there are well-pleaded factual allegations, a court should

suggest a relationship between a corporate parent and its wholly owned subsidiaries. *Cf. Moore v. Cohen*, 548 F. Supp. 3d 330, 339 (S.D.N.Y. 2021) (concluding that the defendant, Cohen, was a parent of other defendants where he was their "sole member"), *aff'd sub nom. Moore v. Baron Cohen*, No. 21-CV-1702, 2022 WL 2525722 (2d Cir. July 7, 2022). Given this relationship, the intracorporate conspiracy doctrine applies and Plaintiffs' conspiracy claim fails. *See U.S. ex rel. Schwartz v. Document Reprocessors of N.Y., Inc.*, 692 F. Supp. 3d 71, 81 n.3 (W.D.N.Y. 2023) ("The Court also notes that Relator's cursory attempt to assert a conspiracy between a corporation and its owners/corporate officers runs afoul of the intra-corporate conspiracy doctrine."); *U.S. ex rel. Ross v. Indep. Health Corp.*, No. 12-CV-299, 2023 WL 24055, at *12 (W.D.N.Y. Jan. 3, 2023) (dismissing a conspiracy claim under the FCA because the claim involved a conspiracy between related corporate entities and their employees).

     5. <u>Retaliation</u>

Finally, the Court addresses Defendants' Motion to Dismiss Dr. Sperling's retaliation claim. Claims for retaliation under the FCA are governed by Section 3730(h) of the False Claims Act. 31 U.S.C. § 3730(h). Courts in this Circuit have applied the *McDonnell Douglas* framework to retaliation claims under the False Claims Act. *See Bernstein v. Silverman*, No. 20-CV-630, 2024 WL 3595621, at *28–30 (N.D.N.Y. July 31, 2024) (applying *McDonnell Douglas* to a retaliation claim under the FCA), *reconsideration denied,* No. 20-CV-630, 2024 WL 5008839 (N.D.N.Y. Dec. 6, 2024)*; Krause v. Eihab Human Servs., Inc.*, No. 10-CV-898, 2015 WL 4645210, at *9 (E.D.N.Y. Aug. 4, 2015) ("[C]ourts in [the Second] Circuit have interpreted

---

assume their veracity" (internal citations and quotations omitted)); *Peckham Materials Corp. v. Raima Corp.*, No. 90-CV-4134, 1995 WL 422158, at *1 (S.D.N.Y. July 18, 1995) ("Plaintiff will not be permitted to treat as a nullity the statements of fact made in its complaint.").

[*Liburd v. Bronx Lebanon Hosp. Ctr.*, 372 F. App'x 137, 139 (2d Cir. 2010)] as implicitly

endorsing the application of the *McDonnell Douglas* framework to Section 3730(h) claims."

(internal citations and quotations omitted) (alterations adopted)).  "Under the *McDonnell*

*Douglas* framework, courts apply the following burden-shift[ing framework]: (1) the employee

bears [] the initial burden of producing evidence sufficient to support a prima facie case of

retaliation; (2) then the burden shifts to the employer to articulate a legitimate, nondiscriminatory

reason for its actions; and (3) finally the burden shifts back to the employee to demonstrate that

the employer's stated reason is a pretext for retaliation."  *Id.* (citing *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 802–04 (1973)) (italics omitted).

At the pleading stage, Plaintiffs can meet their burden by alleging a prima facie case.  *See*

*Bernstein,* 2024 WL 3595621, at *25–30 (assessing the sufficiency of the plaintiff's claims under

the prima facie analysis).  This showing can be made through pleadings that establish: "(1) [the

plaintiff] engaged in activity protected under the statute, (2) the employer was aware of such

activity, and (3) the employer took adverse action against [him] because [he] engaged in the

protected activity."  *Mirza v. Garnet Health*, No. 20-CV-556, 2022 WL 826410, at *8 (S.D.N.Y.

Mar. 17, 2022) (quoting *Dhaliwal v. Salix Pharms., Ltd*., 752 F. App'x 99 (2d Cir. 2019)), *aff'd*

*sub nom. Mirza v. Orange Reg'l Med. Ctr.*, No. 22-CV-815, 2024 WL 3042239 (2d Cir. June 18,

2024).  However, "[a] plaintiff 'need not specifically plead every element' [of the prima facie

case] in order to state a retaliation claim, but 'must allege . . . enough factual matter to render

[the] retaliation claims plausible.'"  *Robinson v. Dep't of Educ.*, No. 20-CV-3388, 2021 WL

12227103, at *9 (E.D.N.Y. Sept. 29, 2021) (quoting *Lopez v. N.Y.C. Dep't of Educ.*, No. 17-CV-

9205, 2020 WL 4340947, at *10 (S.D.N.Y. July 28, 2020)).  Finally, as noted, "[t]he

particularity requirement of [Rule] 9(b) does not apply to retaliation claims under the FCA."  *See*

*Chorches*, 865 F.3d at 95 (citing *Weslowski v. Zugibe*, 626 F. App'x 20, 20 (2d Cir. 2015) and collecting cases)).

Defendants contend that Dr. Sperling's retaliation claim should be dismissed as against all corporate Defendants except NHMP, because only NHMP is Dr. Sperling's employer. (*See* Defs. Mem. 28–29.) Plaintiffs dispute this characterization. (*See* Pls. Opp. 30.) Further, Defendants argue that Plaintiffs' retaliation allegations against NHMP should fail because they are insufficient to show that NHMP was aware of Dr. Sperling's protected activity. (*See* Defs. Mem. at 29.) Plaintiffs argue that they have sufficiently alleged Dr. Sperling's employers were aware, or should have been aware, of Dr. Sperling's protected activity. (*See* Pls. Opp. 30–31.)

### a.   Whether Corporate Defendants are Employers

Defendants argue that only NHMP can be held liable for the alleged retaliation against Plaintiff, because only NHMP is Dr. Sperling's employer, and because only an *employer* may retaliate within the meaning of the statute. (*See* Defs. Mem. 28–29.) Plaintiffs argue that they have sufficiently alleged Dr. Sperling was employed by corporate Defendants and point to the AC, which alleges that Dr. Sperling was "an employee, contractor, or agent of Defendants Nuvance []; [NHMP], [HQS], and Vassar." (*See* AC ¶ 288.)

Section 3730(h), the statutory provision covering retaliation under the False Claims Act, protects "employee[s], contractor[s], or agent[s]" against retaliation. *See* 31 U.S.C. § 3730(h). This language was amended in 2009 to expand the scope of the Section 3730(h) beyond direct employer-employee relationships to contactor and agency relationships, largely "to correct recent court decisions that denied FCA retaliation protection to persons in employment-like relationships that were not technically 'employees' because Congress found the decisions unduly narrow." *See Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1062–63 (6th Cir. 2014)

(citing *US ex. rel. Hussein v. Sci. Applications Int'l Corp.*, No. 09-CV-1858, 2012 WL 6892716, at *3–4 (D.S.C. May 3, 2012), *aff'd* 475 F. App'x 851 (4th Cir. 2012) (per curiam)); *see also Mason v. Health Mgmt. Assocs., LLC*, 421 F. Supp. 3d 237 (W.D.N.C. 2019) ("The 2009 amendments sought to correct what Congress viewed as the unduly narrow interpretation that the courts had given to the term 'employee.'" (citation omitted)). The 2009 amendments were intended to "'correct this loophole'' and extend protection to "individuals who are not technically employees within the typical employer[-]employee relationship, but nonetheless have a contractual or agent relationship with an employer.'" *Hussein*, 2012 WL 6892716, at *3 (quoting S. REP. No. 110-507, 110th Cong., 2nd Session (Sept. 25, 2008) 2008 WL 4415147, at *27). The history of the amendments to Section 3730(h) therefore suggests that Congress intended to expand the scope of FCA retaliation liability to include employment-like dynamics. *Abreu Velez v. Gilead Scis., Inc.*, No. 19-CV-3299, 2021 WL 1922936, at *4 (N.D. Ga. Feb. 8, 2021) (collecting cases).[11]

Courts addressing this issue have found an "employment-like" relationship where corporate defendants had "the capacity to exert some control over a physician['s] continued employment." *U.S. ex rel. Heesch v. Diagnostic Physicians Grp., P.C.*, No. 11-CV-364, 2014 WL 1410412, at *2 (S.D. Ala. Apr. 11, 2014). In *United States ex rel. Rubar v. Hayner Hoyt Corp.*, 306 F. Supp. 3d 478 (N.D.N.Y. 2018), for example, the court determined that entities

---

[11] Contrary to Defendants' claims, *Chorches* is not to the contrary. (*See* Defs. Mem. at 28 (citing *Chorches*, 865 F.3d at 95); Defs. Rep. 14 (same).) The question of whether an entity must be a direct employer of the plaintiff was not at issue in *Chorches*. *See id*. at 95–99. Instead, in *Chorches*, there was no dispute that the defendant was the plaintiff's "true employer." *See id*. at 75–78 (stating that "Fabula [the plaintiff] worked as an Emergency Medical Technician ("EMT") in the New Haven, Connecticut branch office of AMR [the defendant], the largest ambulance company in the United States," where AMR was the defendant accused of retaliating against the plaintiff).

other than the plaintiff's direct employer could be proper defendants in an FCA retaliation claim where they exercised a "high-level of control" over the plaintiff and where there was a "commonality of ownership" and a "close relationship" between the plaintiff's direct employer and the other corporate defendants. *See id*. at 484–85. Crucially, however, the *Rubar* court also found that other corporate defendants were not proper defendants because the plaintiff "[did] not allege facts to demonstrate that either [corporate defendant] . . . maintained a similarly-situated relationship with him *or level of control over him as an employee*." *See id.* at 485 (emphasis added). Similarly, in *Baxter v. The Grand Lodge of the Independent Order of Odd Fellows of Colorado*, No. 24-CV-984, 2025 WL 817386 (D. Colo. Jan. 27, 2025), the court determined that affiliated corporate defendants were not proper defendants under Section 3730(h) after applying an "interrelationship test." *Id.* at *3–4. The court found no "interrelationship" where there was no evidence that the affiliated defendant "maintained a relationship with [the plaintiff] or level of control over [the plaintiff] as an employee." *See id*. (citing *Rubar*, 306 F. Supp. 3d at 485).[12]

_____

[12] The *Baxter* court also applied the common law's veil piercing test. *See id*. at *4. Even assuming such a test would be applicable to the question of who is an "employer" under Section 3730(h) of the FCA, the Court determines Plaintiffs have not adequately alleged sufficient facts to permit the Court to "pierce the veil" between NHMP and remaining corporate Defendants. Because all corporate defendants are alleged to be New York corporations, New York law controls. *U.S. ex rel., Taylor v. GMI USA Corp*., No. 16-CV-7216, 2025 WL 815406, at *16 (S.D.N.Y. Mar. 13, 2025) (citing *Taizhou Zhongneng Import & Export Co. v. Koutsobinas*, 509 F. App'x 54, 56 n.2 (2d Cir. 2013) (summary order)). "To pierce the corporate veil under New York law, a plaintiff must establish (1) 'that the owner exercised complete domination over the corporation with respect to the transaction at issue' and (2) 'that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil.'" *Id*. at *16 (quoting *Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, 270 F. Supp. 3d 716, 726 (S.D.N.Y. 2017) (quoting *Thrift Drug, Inc. v. Universal Prescription Administrators*, 131 F.3d 95, 97 (2d Cir. 1997))). "'While complete domination of the corporation is the key to piercing the corporate veil, . . . such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward the party seeking piercing is required.'" *Id*. (alterations adopted) (quoting *In re Platinum-Beechwood Litigation*, 427 F. Supp. 3d 395, 445 (S.D.N.Y. 2019)

By contrast, in *Heesch*, the Court found the complaint had adequately alleged an employment-like relationship between plaintiff-physician and the defendants, even though the plaintiff did not allege a direct employment relationship between himself and those defendants. *See* 2014 WL 1410412, at *2 (noting that the plaintiff alleged he was an "employee, contractor, or agent" of defendants "due to the inextricably intertwined relationships between [his employer and the other defendants]").  The complaint alleged that revenues generated by the plaintiff were "assigned" to the defendants and that they later paid the plaintiff out of the revenue generated by the plaintiff, and that the defendants had sole control over whether to extend admitting privileges to the plaintiff.  *See id.*  The court found that the allegations plausibly suggested that the defendant could revoke the plaintiff's right to use its infirmary to provide services, and that there was a "reasonable inference" that the defendants had some control over the amount of compensation the plaintiff received.  *Id.*

This case law is consistent with lower court decisions within the Second Circuit holding that, in employment retaliation cases, separate entities may be held liable as a plaintiff's employer where (1) "two nominally separate entities are actually part of a single integrated enterprise," *see Popat v. Levy*, No. 15-CV-1052, 2024 WL 3652947, at *16 (W.D.N.Y. Aug. 5, 2024) (quoting *Lima v. Addeco*, 634 F. Supp. 2d 394, 399–400 (S.D.N.Y. 2009)), or where (2)

---

(quoting *Morris v. N.Y. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 141, 603 N.Y.S.2d 807, 811 (1993))).
    Plaintiffs allege that Nuvance is the sole owner of HQS, NHMP, and Vassar, and that NHMP or HQS is the parent of Heart Center.  (*See* AC ¶ 131.)  But without more, these allegations do not permit the court to pierce the veil between these entities.  *See Miami Prods. & Chem. Co. v. Olin Corp.*, 449 F. Supp. 3d 136, 173 (W.D.N.Y. 2020) (holding that the allegation that "OxyChem is a wholly-owned subsidiary of defendant Oxy" was insufficient to permit the court to pierce the veil); *In re Digital Music*, 812 F. Supp. 2d 390, 419 (S.D.N.Y. 2011) ("It is clear that simply owning, even wholly owning, a subsidiary is insufficient to pierce the corporate veil.").

there was "joint control" such as where an entity has "control over an employee's hiring, firing, training, promotion, discipline, supervision, handling of records, insurance, and payroll," *Zhornitsky v. Yale Sch. of Med.*, No. 24-CV-18, 2024 WL 4880695, at *4 (D. Conn. Nov. 25, 2024) (quoting *Felder v. U.S. Tennis Ass'n*, 27 F.4th 834, 838 (2d Cir. 2022)).

Here, the AC plausibly alleges that Vassar was Dr. Sperling's direct employer at the time of his termination. (*See* AC ¶¶ 176 (discussing Vassar and Plaintiffs, including Dr. Sperling, as "the hospital and *its* physicians" (emphasis added)), 199 ("[Dr. Sperling] began expressing these concerns almost *as soon as he began his employment with Vassar* in January 2018 . . . .").) Indeed, the AC alleges that Dr. Sperling was the Chief of Cardiovascular Surgery at Vassar from January 2018 to October 2022, (*see* AC ¶ 36), a title that itself suggests a more direct relationship between Vassar and Dr. Sperling than the relationships at issue in *Baxter*, *Rubar*, or *Heesch*. *See Baxter*, 2025 WL 817386, at *4 (plaintiff had no titled position with corporate defendant); *Rubar*, 306 F. Supp. 3d at 484–85 (same); *Heesch*, 2014 WL 1410412, at *2 (same). Just as in *Heesch*, the allegations indicate that Vassar billed Medicare for the work done by Dr. Sperling. (*See* AC ¶ 200.) Furthermore, Dr. Sperling reported to Vassar administrators, (*see id.*; *see also id.* ¶ 217), and was ultimately put on leave by Vassar itself, (*see id.*). These allegations, in combination, are sufficient to plausibly suggest an employment or employment-like relationship between Vassar and Dr. Sperling. *See Heesch*, 2014 WL 1410412, at *2 (looking at a number of facts to conclude that there was an employment relationship).

As to Nuvance, the AC alleges that it was Nuvance that "found a replacement and immediately placed Dr. Sperling on administrative leave." (*See* AC ¶ 233.) This allegation, while admittedly meager, does suggest that Nuvance had "the capacity to exert some control over [Dr. Sperling's] continued employment." *Heesch*, 2014 WL 1410412, at *2. Further, it

more directly pleads an employment-like relationship than the allegations in *Baxter*. 2025 WL 817386, at *3–5. There, the court found that the plaintiff had failed to plead that the corporate parent of her direct employer "had anything to do with her employment," where the complaint merely alleged that the corporate parent "h[eld] a seat on [the direct employer's] board," where other subsidiaries of the corporate parent were involved in her direct employer's management decisions, and where the chairman of the corporate parent's board had complained about whistleblowing by employees of its subsidiaries. *See id.* at *4. And unlike in the allegations that led to the dismissal of some of the defendants in *Rubar*, the AC here directly alleges that Nuvance exercised "control over [Dr. Sperling] as an employee" when it placed him on leave. *See* 306 F. Supp. 3d at 485. For this reason, the Court concludes that Plaintiffs have also adequately—though narrowly—alleged Nuvance was in an "employer-like" relationship with Dr. Sperling.

However, the same determination cannot be made with respect to HQS. As discussed previously, the AC makes almost no mention of HQS, aside from its corporate relationships with Nuvance and NHMP. (*See generally* AC.) A corporate parent is not an "employer" of its subsidiaries simply by virtue of its relationship with those subsidiaries. *See Baxter*, 2025 WL 817386, at *4; *accord Earl v. Good Samaritan Hosp. of Suffern NY*, 625 F. Supp. 3d 292, 300 (S.D.N.Y. 2022) ("There is a strong presumption that a parent is not the employer of its subsidiary's employees." (quoting *Guzman v. News Corp.*, No. 09-CV-9323, 2013 WL 5807058, at * 8 (S.D.N.Y. Oct. 28, 2013)), *aff'd*, No. 22-CV-2505, 2023 WL 8708417 (2d Cir. Dec. 18, 2023).

\* \* \*

37

In sum, the AC only plausibly alleges that NHMP, Nuvance, and Vassar were Dr. Sperling's employers, and therefore only those entities may be held liable under Section 3730(h) of the FCA.

    b. <u>Protected Activity and Knowledge</u>

Section 3730(h) protects "lawful acts done by the employee . . . in furtherance of . . . efforts to stop 1 or more violations of [the FCA]." *Chorches*, 865 F.3d at 95 (quoting 31 U.S.C. § 3730(h)(1)).  The Parties do not dispute that Dr. Sperling engaged in protected activity, (*see* Defs. Mem. 28–29; Pls. Opp. 29–31; Defs. Rep. 13–14), nor could they.  The AC alleges that Dr. Sperling complained several times that the TAVR program was being administered in a manner that he believed entailed Medicare fraud.  (*See* AC ¶¶ 199–200.)  The AC also alleges that Dr. Sperling refused to append modifier 62 (which indicates that two different specialists participated in the surgery) when billing for TAVRs in which he felt he did not actually jointly participate.  (*See id*. ¶ 200.)  Both Dr. Sterling's refusal to participate and the complaints he lodged with various members of the administration constitute protected activity.  *Chorches*, 865 F.3d at 95–96 (holding that the plaintiff's "refusal to falsify" was protected conduct under the FCA); *see also Mehta v. Univ. of Rochester Med. Ctr.*, No. 21-CV-6299, 2025 WL 461429, at *4 (W.D.N.Y. Feb. 11, 2025) (concluding that the plaintiff had adequately alleged protected activity where she "lobb[ied] her supervisors to comply with [the NIH's] requirements" and "lodg[ed] complaints with [officials] about the noncompliance"); *U.S. ex rel. Taylor v. GMI USA Corp.*, 714 F. Supp. 3d 275, 293 (S.D.N.Y. 2024) (concluding that the plaintiff "engaged in protected conduct by raising concerns, and refusing to go along[] with her employer about improper conduct"); *Liss v. Heritage Health & Housing, Inc.*, No. 19-CV-4797, 2023 WL 2267366, at *6 (S.D.N.Y. Feb. 28, 2023) (collecting cases and stating that "an employee engages in protected

FCA conduct when the employee makes complaints about the organization's [violation of the FCA]").

However, the Parties dispute whether Defendants had sufficient knowledge of Dr. Sperling's protected activity to be held liable under the statute. To state a claim under Section 3730(h) of the FCA "[a] plaintiff must also allege that 'his employer was aware that he was engaged in conduct that is protected by section 3730(h).'" *United States v. Spectra Holdco, LLC*, No. 17-CV-2732, 2024 WL 457110, at *7 (E.D.N.Y. Feb. 6, 2024) (quoting *Weslowski*, 626 F. App'x at 21)). "The requisite 'standard for notice is flexible: the land of knowledge the defendant must have mirrors the kind of activity in which the plaintiff must be engaged.'" *Id.* (quoting *Swanson v. Battery Park City Auth.*, No. 15-CV-6938, 2016 WL 3198309, at *5 (S.D.N.Y. June 8, 2016)).

Defendants argue that no allegation plausibly suggests that NHMP received notice of Dr. Sperling's protected activity. (*See* Defs. Mem. 29.) Plaintiffs respond that the allegations "plausibly support the inference that [Nuvance's] close affiliate, [NHMP], became aware of Dr. Sperling's protected activity," because Dr. Sperling "reported his concerns promptly to the hospital where he worked every day, that hospital's leadership, and its parent company [Nuvance]." (*See* Pls. Opp. 30.)

But the question of NHMP's knowledge is inapposite, as Plaintiffs' clearly allege that it was Nuvance and Vassar—rather than NHMP—that terminated or demoted Dr. Sperling. (*See* AC ¶ 200 ("the *hospital* . . . removed Dr. Sperling from his chief position and placed him on paid administrative leave until his contract expired in July 2023 (emphasis added)); *id.* ¶ 233 ("Nuvance found a replacement and immediately placed Dr. Sperling on paid administrative

leave.").) Therefore, Plaintiffs need only show that Vassar and Nuvance were aware of Dr. Sperling's activity.

Here, the AC alleges that Dr. Sperling complained often to Vassar and Nuvance's administrations about what he viewed as fraudulent practices. (*See* AC ¶ 200 (alleging that Dr. Sperling "repeatedly objected to reports of minimal surgeon participation," "brought this issue up repeatedly in meetings with *hospital leadership*," "provided written explanations of his concerns to *hospital leaders*," including in "meetings with the leadership of *Nuvance's* Heart and Vascular Institute") (emphasis added).) These allegations are sufficient to plausibly suggest that Vassar and Nuvance were aware of Dr. Sperling's protected activity. *See Taylor*, 714 F. Supp. 3d at 293 (determining that the plaintiff had adequately alleged knowledge where she "informed" the defendants "of the illegal conduct"); *Mehta*, 2025 WL 461429, at *5 (determining at summary judgment that the plaintiff had met the notice requirement where she "notified multiple . . . officials that her work was not in compliance"); *Spectra*, 2024 WL 457110, at *7 (determining there were sufficient allegations of the defendants' knowledge where "[plaintiff] informed several high-level executives" of his protected activity).

Therefore, Plaintiffs have adequately pled that Dr. Sterling engaged in protected activity and that that Vassar was on notice about that activity.

c. Adverse Action

To state a claim for retaliation under Section 3730(h), Plaintiffs must demonstrate that Dr. Sperling suffered an adverse action because he "engaged in the protected activity." *United States v. Applied Memetics, LLC*, No. 21-CV-270, 2024 WL 5316335, at *20 (D. Vt. Dec. 4, 2024) (quoting *Chorches*, 865 F.3d at 95). "Because the Second Circuit has yet to define 'adverse action' in the context of FCA retaliation claims, courts in the Second Circuit have

applied the approach of other Circuits and adopted the material adversity standard used in the Title VII context." *Id.* at 22 n.4; *see also Parris v. NY.C. Hous. Auth.*, No. 18-CV-8299, 2024 WL 1363582, at \*10 (S.D.N.Y. Mar. 29, 2024) (granting the defendants' summary judgment motion as to retaliation under the FCA where the plaintiff had not "provided any evidence from which a rational jury could conclude that [one defendant] created a material adverse change in the terms and conditions of his employment"); *Spectra*, 2024 WL 457110, at \*7 (using *Vega v. Hempstead Union Free School District*, 801 F.3d 72 (2d Cir. 2015), a Title VII case, to determine materiality). "Under this standard, '[e]xamples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Parris*, 2024 WL 1363582, at \*10 (quoting *Vega*, 801 F.3d at 85 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003))).

Dr. Sperling alleges that in December 2021, he was told the hospital system would begin searching for his replacement. (*See* AC ¶ 233.) In October 2022, his replacement was identified and he was placed on administrative leave until his contract expired. (*See id*.) "The Second Circuit has made clear that placing an employee on 'suspension with pay may sometimes rise to the level of an adverse employment action.'" *Johnson v. J. Walter Thompson U.S.A., LLC*, 224 F. Supp. 3d 296, 314 (S.D.N.Y. 2016) (quoting *Brown v. City of Syracuse*, 673 F.3d 141, 151 (2d Cir. 2012) (citing *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006))). "The key question is whether the administrative leave 'changed the terms and conditions of employment' or was coupled with other actions—something more—that, together with administrative leave, did so." *Id*. (quoting *Brown*, 673 F.3d at 150–51). Here, because Dr. Sperling's contract was not renewed following his paid leave, the Court concludes he has adequately alleged that the leave "changed

the terms and conditions of employment" in a manner that constituted adverse action. *Johnson*, 224 F. Supp. 3d at 314 (internal quotation marks omitted); *see Carman-Nurse v. Metro. Dist. Comm'n*, No. 16-CV-1987, 2018 WL 3935025, at *12 (D. Conn. Aug. 15, 2018) ("Because [the defendant] terminated [the plaintiff] following th[e paid] leave, [the plaintiff] has established that there was an adverse action." (citing *Vega*, 801 F.3d at 85); *see also Edelman v. NYU Langone Health Sys.*, No. 21-CV-502, 2022 WL 4537972, at *8 (S.D.N.Y. Sept. 28, 2022) ("At the prima facie case stage, Defendants' decision not to renew Plaintiff's contract—effectively firing her—constitutes an adverse employment action."). Thus, the AC adequately alleges adverse action as to Dr. Sperling.

### d. Causation

Finally, to succeed on a retaliation claim, Dr. Sterling must establish that the adverse action he suffered was causally connected to her protected activity. *See Applied Memetics*, 2024 WL 5316335, at *23 (D. Vt. Dec. 4, 2024) (assessing causation in the context of an FCA retaliation claim); *United States v. Maranatha Human Servs., Inc.*, No. 18-CV-8892, 2024 WL 967093, at *12 (S.D.N.Y. Mar. 5, 2024) (noting that a prima facie retaliation claim requires "'a causal connection between the protected activity and the adverse employment action'" (quoting *Liss*, 2023 WL 2267366, at *9)). "A plaintiff can demonstrate the causal connection one of two ways: '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *Cowan v. City of Mount Vernon*, No. 14-CV-8871, 2017 WL 1169667, at *11 (S.D.N.Y. Mar. 28, 2017) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)); *see also Royall v. City of Beacon*, No.

24-CV-3, 2024 WL 4266546, at \*17 (S.D.N.Y. Sept. 23, 2024) (noting that the plaintiff's claims suggested direct or indirect evidence of a causal connection).

While the AC clearly alleges that Dr. Sperling raised certain complaints to hospital administrators, (*see* AC ¶¶ 199, 200), it fails to provide dates associated with those complaints. Instead, the AC alleges generally that Dr. Sperling "began expressing these concerns almost as soon as he began his employment with Vassar in January 2018 *and continued doing so until he was forced to leave Vassar*," and that he raised these concerns "in *regular* meetings with the leadership of [the] Heart and Vascular Institute". (*See id.* ¶199 (emphasis added).) These allegations are insufficiently specific to permit the Court to determine whether Plaintiffs have adequately pled temporal proximity. *See Bernardi v. N.Y. State Dep't of Corr.*, No. 19-CV-11867, 2021 WL 1999159, at \*12 (dismissing a plaintiff's retaliation claim on causation grounds where the plaintiff alleged he "frequently" complained and made "many complaints" but did not provide actual dates); *see also Bergesen v. Manhattanville Coll.*, No. 20-CV-3689, 2021 WL 3115170, at \*10 (S.D.N.Y. July 20, 2021) ("Because Plaintiff 'has provided no dates of [the protected activity], . . . the [c]ourt cannot determine whether there was a genuine temporal proximity between them." (quoting *Anand v. N.Y. State Dep't of Tax'n & Fin.*, No. 10-CV-5142, 2012 WL 2357720, at \*10 (E.D.N.Y. June 18, 2012)); *see also Cowan*, 2017 WL 1169667, at \*11 (holding that "without a clear timeline of . . . events" the court could not determine whether the protected activity and adverse action were "close enough in time to allow for an inference of causation"). This deficiency prevents the Court from finding temporal proximity, and therefore from inferring causation through indirect evidence.

Further, the AC alleges no facts which plausibly suggest *Vassar's* retaliatory animus. (*See generally* AC.) The AC describes the hospital as generally responding to Dr. Sperling's

complaints with "resistance, retaliation, and an expectation to toe the party line." (*See* AC ¶

200.) However, these kinds of general allegations are insufficient to establish Vassar's

retaliatory animus. *See Dechbery v. City of New York,* No. 14-CV-2130, 2017 WL 11683338, at

*9 (E.D.N.Y. Mar. 31, 2017) ("[The plaintiff's] conclusory allegations of retaliation are

insufficient to survive a motion to dismiss."); *Romero v. City of New York*, No. 16-CV-4157,

2016 WL 6155935, at *7 (E.D.N.Y. Oct. 21, 2016) (dismissing a plaintiff's retaliation claims

where the plaintiff "allege[d] retaliation in conclusory fashion," because "a conclusory allegation

that the action was retaliation is not sufficient under either *Twombly* or *Iqbal*").

     However, Plaintiffs also allege that the hospital placed Dr. Sperling on leave at the

direction of Jafar and Narayan, (*see* AC ¶ 200; Pls. Mem. 29), and argue that this is sufficient to

establish retaliatory animus, (*see* Pls. Mem. 29 (noting that "at the cardiologists urging [Dr.

Sperling] was placed on administrative leave until his contract expired . . . [t]his allegation

satisfies the retaliation and causation elements")). Where, "as is the case here, there is no

evidence that the ultimate decision maker harbored retaliatory animus," a plaintiff must show

"that the ultimate decision maker, in issuing the challenged employment decision, relied on

statements made by the person harboring retaliatory or discriminatory animus." *Lin v. N.Y. State

Dep't of Labor*, No. 14-CV-771, 2017 WL 435811, at *8–9 (N.D.N.Y. Feb. 1, 2017); *see also

Alcy v. Northwell Health, Inc.*, No. 23-CV-88, 2025 WL 835647, at *7 (S.D.N.Y. Mar. 14, 2025)

(same). Further,

> [w]hen courts in this circuit hold that someone other than the ultimate decision
> maker "taint[ed] the ultimate employment decision in violation of Title VII," there
> is typically some *concrete evidence (or a plausible allegation)* that the ultimate
> decision maker, in issuing the challenged employment decision, relied on
> statements made by the person harboring retaliatory or discriminatory animus.

*Lin*, 2017 WL 435811, at *9 (emphasis added) (citation omitted) (collecting cases). In cases

"where such evidence is lacking, there is usually some indication that the person harboring

retaliatory animus had a 'singular influence' or 'dominated' the ultimate decision maker." *Id.* (quoting *Geras v. Hempstead Union Free Sch. Dist.*, 149 F. Supp. 3d 300, 328 (E.D.N.Y. 2015)).

Here, Plaintiffs' allegations are perhaps insufficient to plead "concrete evidence" of discussions about Dr. Sperling's employment between Vassar leadership and Defendant cardiologists. However, Plaintiffs have pled sufficient additional facts to raise an inference that Drs. Jafar and Narayan "dominated" the ultimate decision maker and harbored retaliatory animus against Dr. Sperling so as to cause Vassar to place Dr. Sperling on leave.

As to the first point, the AC simply alleges that that Dr. Sperling was terminated by Vassar "at the interventional cardiologists' direction." (*See* AC ¶ 200; *see also* Pls. Mem. 29 (arguing that Dr. Sperling was fired "at the cardiologists' urging").) This allegation is perhaps insufficient, on its own, to allege that Jafar and Narayan directed Dr. Sperling's termination. *See Lin*, 2017 WL 435811, at *10 (rejecting the plaintiff's discrimination claims a non-decision maker had "interjected herself" into the hiring process, but there was no evidence that the decision maker relied on those statements in taking the adverse action); *Lampros v. Banco do Brasil, S.A.*, No. 10-CV-9576, 2012 WL 6021091, at *8 (S.D.N.Y. Dec. 4, 2012) (rejecting plaintiff's contention that the decision maker's knowledge of non-decision maker's dispute with the plaintiff was evidence that the non-decision maker impermissibly "influenced" the adverse action), *aff'd*, 538 F. App'x 113 (2d Cir. 2013).

However, the AC's allegations support an inference that Drs. Jafar and Narayan were given "unfettered control" over the structural heart program in exchange for their steady stream of referrals, (*see* AC ¶ 129; *see also id.* ¶¶ 122, 132–33, 140, 147), and that the hospital had "no power to control [Jafar and Narayan]," (*see id.* ¶ 150). The allegations are also replete with facts suggesting that Jafar and Narayan harbored retaliatory animus against Dr. Sperling. For

example, Plaintiffs allege that Narayan once loudly commented, within earshot of Dr. Sperling:

"it's a real red wedding on cardiac surgery, eh? Never going to know who's going to be next to

fall, right?" (*See id.* ¶ 225.)  On another occasion, the AC alleges that Narayan told Dr.

Sperling's colleague: "We are going to have Jason [Dr. Sperling] fired.  We have spoken to the

CEO and discussed this at the highest levels. . . . I have called surgeons that I know in [New

Jersey] and [New York City] to see if they would like to look at the chief position here." (*See id.*

¶ 227.)  These statements clearly evince retaliatory animus.  *See Marquez v. Hoffman*, No. 18-

CV-7315, 2021 WL 1226981, at *20 (S.D.N.Y. Mar. 31, 2021) (determining that a defendant's

statement "that [the plaintiff] would be fired within one week" was "direct evidence of

retaliatory animus"); *Barclay v. Michalsky*, 451 F. Supp. 2d 386, 398 (D. Conn. 2006) (noting

that the defendant's threats that plaintiff "quit or be fired" were "direct evidence of retaliatory

animus").

In combination, Plaintiffs' allegations that Jafar and Narayan directed the hospital to

terminate Dr. Sperling, that they wielded enormous power at the hospital, and that they held

strong retaliatory animus against Dr. Sperling are sufficient to plausibly allege causation.  *See*

*Gonzalez v. Conn. Dep't of Corr.*, No. 20-CV-736, 2021 WL 1923785, at *15 (D. Conn. May 13,

2021) (noting that the plaintiff could establish causal influence of a non-decision maker through

pleadings that suggested the "person harboring retaliatory animus had a singular influence or

dominated the ultimate decision maker" (internal quotation marks omitted)); *Rose v. N.Y.C. Bd.*

*of Educ.,* 257 F.3d 156, 162 (2d Cir. 2001) (discriminatory comments of plaintiff's supervisor,

who did not have formal firing authority but who "had enormous influence in the decision-

making process," constituted direct evidence of discrimination); *Donie v. Walmart, Inc.*, No. 12-

CV-6213, 2014 WL 3894488, at *3 (W.D.N.Y. Aug. 8, 2014) ("Causation . . . 'can be satisfied

by showing that a person with discriminatory animus toward the plaintiff influenced the actual decisionmaker'" (quoting *Sadki v. SUNY Coll. at Brockport,* 310 F.Supp.2d 506, 513 (W.D.N.Y. 2004) (internal quotation marks omitted)).

For the foregoing reasons, Plaintiffs have plausibly alleged causation.

* * *

Because Plaintiffs have plausibly pled all elements of a retaliation claim, Plaintiffs' retaliation claim against Vassar and Nuvance may go forward.  All other retaliation claims are dismissed.

### III.    Conclusion

For the reasons set forth above, the Motion is granted in part and denied in part. To summarize: Plaintiff's FCA claims as to the violation of the joint participation requirement survive. However, the Court dismisses all claims against HQS, NHMP, and Dr. Warshofsky. The Court also dismisses Plaintiffs' claims as to the Stark Law and conspiracy under the FCA. Finally, the retaliation claim only survives as to Vassar and Nuvance.

The Clerk of the Court is respectfully directed to terminate the pending Motion, (Dkt. No. 46).  The Court will hold a status conference on May 13, 2025 at 10:30 A.M. via teleconference.


SO ORDERED.

Dated:    March 31, 2025
              White Plains, New York

_____
   KENNETH M. KARAS
   United States District Judge

47